IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

SEPTEMBER 1998 SESSION



**FILED**

**May 11, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9709-CC-00414 |
| | ) | |
| | ) | Sevier County |
| v. | ) | |
| | ) | Honorable Rex Henry Ogle, Judge |
| | ) | |
| WILLIAM B. THURBLEY, | ) | (First degree murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Edward C. Miller
District Public Defender
P.O. Box 416
Dandridge, TN 37725

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
          and
Elizabeth B. Marney
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Alfred C. Schmutzer, Jr.
District Attorney General
          and
Steven Hawkins
Assistant District Attorney General
301 Sevier County Courthouse
Sevierville, TN 37862

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, William B. Thurbley[1], appeals as of right following his convictions by a jury in the Sevier County Circuit Court for premeditated murder and felony murder committed in the perpetration of a kidnapping. The defendant was originally indicted, as well, for felony murder committed in the perpetration of a robbery, burglary or theft, but that charge was dismissed by the trial court at the close of proof. The defendant received life sentences for each conviction, but the trial court merged the convictions into one judgment to reflect one life sentence to be served in the custody of the Department of Correction. The defendant presents the following issues for our review:

> (1) whether the evidence is insufficient to support a conviction for premeditated murder;
>
> (2) whether he was properly convicted of felony murder in the perpetration of a kidnapping;
>
> (3) whether the trial court erred by denying a continuance in the absence of a material defense witness;
>
> (4) whether the trial court erred by failing to declare a mistrial because of prejudicial and irrelevant testimony from two state's witnesses;
>
> (5) whether the trial court erred by allowing the state to cross-examine the defendant's character witnesses regarding the defendant's alleged prior bad acts;
>
> (6) whether the trial court erred by not allowing testimony regarding the defendant's trustworthiness around money and other valuables and his reputation for honesty;
>
> (7) whether the assistant district attorney committed misconduct during closing argument; and
>
> (8) whether the trial court erred by instructing the jury on parole eligibility.

We affirm the judgment of conviction.

---

[1]We note that numerous variations of the defendant's last name appear throughout the record, from Thurlby to Thurbly to Thorlby. Because the defendant's name is spelled "Thurbley" in the first indictment, we will use that spelling in this opinion.

Santo Bimonte testified that he owns Santo's Italian Restaurant in Pigeon Forge. He said that he had known the victim, Tony Desanto, for eight to ten years and that the victim worked for him as a waiter. Mr. Bimonte said that the victim had been experiencing back problems and had been off work for two or three weeks before his death. He described the victim as a perfectionist and a model employee. He stated that on the Thursday or Friday before the victim's death, he accompanied the victim to Jerry Ward's house because the victim was interested in buying Mr. Ward's truck. Mr. Bimonte said the victim was supposed to work on Friday, but the victim asked for an extra day off because of his back problems. Mr. Bimonte testified that the victim said he would be at work on Saturday at around 4:00 or 5:00 p.m. Mr. Bimonte said he became worried on Saturday when the victim did not show up for work, and he asked a mutual friend, Robert Franklin, to check on the victim. Mr. Bimonte said that when Mr. Franklin could not find the victim, Franklin left a note on the victim's car. Mr. Bimonte stated that he never saw the victim upset, angry or violent. He said the victim always carried a dark gym bag.

On cross-examination, Mr. Bimonte said he did not know that the defendant was a friend of the victim. He said he did not know that the victim sold or smoked marijuana.

Deborah Bimonte testified that she was the dining room manager at her husband's restaurant, and her testimony was substantially similar to her husband's testimony. She stated that the victim was of medium build and was not in very good physical condition. She said the victim was peaceful. On cross-examination, she stated that waiting tables can be physically demanding but that she gave the victim a small station.

3

Robert Franklin testified that he and the victim had worked together at the Edgewater Hotel. He said that the victim had back problems and that he brought the victim a heating pad the week before the victim died. He said the victim moved slowly and was not muscular. He said that on Saturday, January 20, 1996, Mr. Bimonte called him and told him that the victim had not shown up for work. He said Mr. Bimonte asked him to check on the victim, and he agreed he would. He said that the victim's truck was parked outside his apartment, and he knocked lightly on the apartment door because he thought the victim might be sleeping. He said that when the victim did not answer, he put a note on the door and left. Mr. Franklin said the victim always carried a black gym bag with him that contained magazines and clothes. He said he never saw the victim act violently.

On cross-examination, Mr. Franklin said he did not know that the defendant was a close friend of the victim. He said he knew that the victim smoked marijuana and sold it out of his home.

Jerry Ward testified that he is a friend of Mr. Bimonte and that he knew the victim from the restaurant. Mr. Ward said that the day before the victim died, the victim came to his house to look at a truck he wanted to sell.

Irene Capiello testified that she lived with Dean Okie in a farmhouse that was converted into apartments and that they were the victim's neighbors. She said the apartment walls were thin, and she could hear from one apartment to another. She said the victim had been experiencing back problems and was off work but was planning to return to work on Saturday. She testified that the weather was very cold on Friday, January 19.

4

Ms. Capiello testified that the victim did not have a telephone, and he came to her apartment on Friday to call the restaurant and tell them he would not be at work until Saturday. She said she and the victim shared a marijuana cigarette at about 4:45 p.m., and the victim went back to his apartment. She said that after the victim left, she heard a car pull in at about 7:00 p.m. She stated that she may have heard another car pull in and out sometime before 10:45 p.m. but that she never heard any loud noises that night. She said she and Mr. Okie went to bed at about 12:50 a.m. She said that on Saturday, Mr. Okie went to see the victim, but the victim did not answer the door.

Ms. Capiello testified that she never saw any duct tape or commercial laundry bags in the victim's apartment. She said she knew the victim and the defendant were friends. She said the police talked to her on Sunday after the victim's body was discovered in his apartment, and she gave the police the names of the victim's friends, including the defendant. She said she called the defendant and left a message for him, and he called her back on Monday. She said Mr. Okie told the defendant about the victim's death, then she told the defendant that she had given his name to the police. Ms. Capiello testified that the victim was extremely passive and avoided confrontation. She explained that once, a neighbor's dogs were barking loudly and disturbing the victim, but he asked Ms. Capiello if she would talk to the neighbor about it because he did not want to confront the neighbor. She stated that the victim was much smaller than the defendant and was not physically able to fight.

On cross-examination, Ms. Capiello testified that the victim came to her apartment about three times on Friday to use the telephone. She said the victim also helped fix her stove because it was uneven, and the victim had to bend down to do this. She said she saw a blue car pull into the driveway on Saturday night, and she believed a man, woman and child were in the car. She said that if there had been a fight

5

between two grown men in the victim's apartment, she would have heard it. She stated that the defendant had always been polite and mannerly toward her.

On redirect examination, Ms. Capiello testified that about three months before the victim's death, the defendant came to her apartment. She said the defendant backed her up and put his arms around her, and this made her nervous.

Dean Okie testified that he lives with Irene Capiello. He said he last saw the victim alive on Thursday, January 18, in front of the victim's apartment. He said the victim was going to look at a vehicle, and the victim said he was feeling better. He said the next day, he went to North Carolina at 7:30 a.m. and did not arrive home until 11:30 p.m. He said that when he pulled into the driveway, the victim's truck was there, and a light was on in the victim's apartment. He said that he would have heard people shouting in the victim's apartment because the walls were thin. He said that on Saturday, he awoke at 8:30 a.m. and went to the victim's apartment at 9:00 a.m. He said he knocked on the door, but the victim did not answer. He said the victim's truck was still in the driveway. He said he knocked on the victim's door again at 12:30 p.m., but the victim still did not answer. He said he stayed home all day.

Mr. Okie testified that on Sunday, he told Ms. Capiello that if the victim's truck was still in the driveway when he returned home from work that evening, he would try to find the victim. He said that when he arrived home from work at 5:00 pm., the victim's truck was in the driveway, and its hood was cool to the touch. He said he banged vigorously on the victim's door, and he saw a note telling the victim to call his place of employment because they were worried. He said he tried to open the door, but it was locked. He said he decided to try to enter through a window on the side of the victim's apartment, and he was able to enter through the spare bedroom window, which was open. He said that when he went into the hallway, he saw the victim's body lying

6

on the floor. He said the body was wrapped in an off-white laundry bag, and the victim's ankles were bound with tape. He said he called 9-1-1. Mr. Okie said the victim was a peaceful person.

On cross-examination, Mr. Okie admitted that he had previously given a statement in which he said he saw the victim on January 19. He said that the date was wrong and that he actually saw the victim on January 18. He said he occasionally smoked marijuana with the victim. He said he knew the defendant, and he knew that the defendant was a friend of the victim.

Joe Graham testified that he had known the victim for eight years. He said that on Friday, January 19, he went to the victim's apartment at about 7:00 p.m. to pay the victim forty dollars he had borrowed. He said the victim was wearing sweatpants, house slippers and a bathrobe, and he was fixing dinner. He said the victim had been having back problems. He said he paid him the forty dollars, and the victim put the money on the coffee table. He said the victim told him he was going back to work on Saturday. Mr. Graham said he saw a bag containing about twenty joints worth of marijuana underneath the victim's chair in the living room. He said they smoked about one-half of a marijuana cigarette and ate dinner. He stated that the victim's black gym bag was on the couch in the living room. Mr. Graham said he left the apartment at about 9:45 p.m., and on that night, he did not see nor had he ever seen any duct tape or a laundry bag in the victim's apartment. He said the victim was five feet, eight-inches tall and was not muscular. He said the victim was very peaceful. He said he had met the defendant once, and the defendant was much larger than the victim.

Jeff McCarter testified that he is a detective with the Sevier County Sheriff's Department. He said he was dispatched to the victim's apartment on the

evening of Sunday, January 21, 1996. He said he found the victim's body lying on its back in the floor of the living room. He said he made a videotape of the scene, and the videotape was played for the jury while Detective McCarter explained what he saw. He said the victim had silver duct tape around his ankles and was wearing sweat pants. He said that from the waist up, the victim was covered by a large, white linen bag. He said the bag was later removed, revealing that the victim's hands were bound by duct tape across the chest, with one arm lying over the other. He said there was a jagged tear or cut in the bag on the opposite side from the victim's face.

Detective McCarter said that each of the victim's legs was individually taped and then taped together. He said the victim's clothes were pulled around his waist, indicating that the victim had been dragged backwards with his feet toward the door. He said the victim's button-up shirt and T-shirt were bundled underneath him. He said the victim's hands were tightly bound, and each arm was bound individually and then together. He said the victim had relatively fresh wounds on his knuckles and hands, abrasions on his nose and face, and a wound or scratch on the left side of his abdomen. He said there was a clump of hair near the victim, and blood was on a shirt.

Detective McCarter testified that his first contact with the defendant was on the Tuesday following the victim's death. He said he drove into the defendant's driveway, but a vicious dog was outside, and he did not get out of the car. He said that instead, he blew his horn for three to five minutes, but nobody came outside. He said he drove across the street and pulled into a gravel parking lot from which he could observe the defendant's driveway. He said he called Agent Davenport and Captain Larry McMahan and told them what happened. He said they met him in the parking lot, and Agent Davenport called the defendant. He said Agent Davenport spoke with the defendant and told him they were coming to his home. Detective McCarter testified that when they drove across the street to the defendant's home, the defendant was standing

8

in the driveway next to his car and had keys in his hand. He said they explained to the defendant that they were investigating a homicide, and the defendant invited them into his home.

He said that he, Agent Davenport, Captain McMahan, and TBI Agent Steve Richardson accompanied the defendant into his home. He said the defendant mainly talked to Agent Davenport. He said he observed the defendant and noticed that the defendant kept his right hand either underneath him or in his pocket during the conversation. He said that when the telephone rang, the defendant reached out with his right hand, and he noticed that the defendant had fresh scratches on the back of his hand. He said the officers began to leave because the defendant said he had no information about the victim's death, but he and Captain McMahan went back to ask the defendant about the scratches on his hand. He said he examined the back of the defendant's hand and saw two long scratches. He said the defendant explained that briars caused the scratches while he was chopping wood. He said that ten days later, he obtained a search warrant and took photographs of the scratches. He said that by then, the injuries had substantially healed.

On cross-examination, Detective McCarter said that the defendant's friends confirmed that the defendant frequently chopped wood, and he admitted that the defendant's home was in a wooded area. Detective McCarter stated that the defendant came to the detective's office on January 30 and gave a statement. He said the defendant admitted that he was at the victim's apartment on Friday, January 19. He testified that the defendant said the victim started a fight by punching him in the face, knocking off his glasses. The defendant said they engaged in mutual combat, and he eventually found some duct tape in a pile of junk in a corner. The defendant told Detective McCarter that he threw the laundry bag over the victim's head to disorient the

9

victim so he could escape. He told Detective McCarter that he slit the bag to allow the victim to breathe.

Detective McCarter testified that the defendant told him he never punched the victim in the face because he knew the victim was a restaurant worker. He said the defendant told him that his primary goal was to detain and disorient the victim in order to get out of the apartment. Detective McCarter said the victim's hands were taped differently than how the defendant explained it in his statement. He said the defendant stated that he thought the victim was alive and breathing when he left the apartment. He also said the defendant stated that he left the duct tape at the apartment and placed a table upright that had been knocked over during the struggle.

On redirect examination, Detective McCarter testified that the defendant is six feet, three inches tall and weighs two hundred pounds. He said that when he and the other officers first spoke with the defendant at the defendant's home, the defendant refused permission to take photographs of his hands. He said that when the defendant came to the station and made a statement, the defendant said that he walked from his house to the victim's apartment at about 11:30 p.m. on Friday night. He testified that the defendant said that he smoked marijuana with the victim that night, then told the victim he was not going to buy any more marijuana from him. He stated that the defendant said this made the victim angry, and the victim cursed and yelled. He said the defendant told him that the victim went to the kitchen, came back out and threw a rock at him.

Detective McCarter testified that the defendant told him that the victim then got a knife. He stated that the defendant said he knocked the knife away and as they struggled, he saw the duct tape. Detective McCarter said the defendant stated that he got on top of the victim and taped his hands and legs together. He said the

10

defendant told him that the victim's hands were ten inches apart, outstretched and straight over the victim's genital area. Detective McCarter testified that at the scene, the victim's hands were not ten inches apart; rather they were tightly taped together. He said the defendant told him that he screamed for Ms. Capiello about twenty times. He said the defendant told him that once he bound the victim, he turned on the television, turned off the lights and left. He said the defendant stated that the victim was moaning and breathing shallowly when he left and that he left the apartment door cracked. Detective McCarter testified that at the scene, the table the victim claimed was knocked over during the struggle was standing upright with a coffee cup containing coffee and a cigarette tray containing ashes on top of it.

On recross-examination, Detective McCarter stated that he found several clumps of hair at the scene, and one clump was in the victim's hand. He said that the defendant told him that when he was on top of the victim, the victim grabbed his hair, pulling him back.

Karen Lanning, a forensic examiner with the FBI Trace Evidence Unit, testified that she examined the hair found at the scene, and the hair was consistent with the defendant's hair and inconsistent with all other samples provided to her. She said the defendant's hair was also found underneath the victim. She said that all of the hair found on the victim's clothing came from either the victim or the defendant. She said it looked like the hair from the defendant had been forcibly removed and would be consistent with the victim having pulled the defendant's hair in a struggle.

Dr. Cleland Blake, the Assistant Chief Medical Examiner for Tennessee, testified that he was called to the victim's apartment on January 21, 1996. He said the victim's body was lying on the floor in the same position as when it was discovered. He said he saw a table and a rock collection partially overturned on the floor. He said the

11

victim had a laundry bag over his head and was wearing blue sweatpants. He said that after removing the laundry bag, he saw that the victim's hands and feet were tightly bound with duct tape. He said the hands were crossed, and each hand was taped individually and then bound together tightly. He said that the victim had injuries to his face and knuckles and that the surface skin on his nose, chin and cheeks was rubbed off like an abrasion. He said the victim had free blood around his lips. He said the victim's knuckles and the backs of his hands were bruised, which indicated that his hands had hit a surface.

Dr. Blake testified that the victim had compression abrasions on his neck, which were associated with mild bleeding around the vessels inside the neck. He said the victim had compression fractures on seven of his ribs, and the fractures were consistent with someone jumping or sitting down hard on the victim's chest. He said he found bleeding around the carotid arteries, which was typical of squeezing and compressing the neck. He said the neck showed only abrasions and not significant outside bruises because one generally does not see bruises if a cloth or padding is used to squeeze the neck. He said the victim's injuries were consistent with choking or squeezing the neck. He determined that the cause of death was compression of the neck which cut off the oxygen supply and caused the victim to asphyxiate. He said the choking would have had to last at least five minutes, and the victim could not have died just from the bag being placed over his head. He said there had to be some compression.

On cross-examination, Dr. Blake testified that he did not examine the duct tape for the presence of teeth marks or saliva. He said he saw hair on the scene, including at least one clump of hair. He said the victim was smothered through the cotton bag, but he did not examine the inside of the victim's nose or his neck area for fibers from the bag. He admitted that in his report, he stated that the neck was

12

symmetrical and unremarkable with no evidence of grasp marks or encircling lines, but he said he meant no marks consistent with strangulation, such as noose marks. He said the victim had external injury in the form of abrasions. He said he found no grasp marks on the neck, but the skin was rubbed off. He said the victim had internal bleeding around the neck vessels which showed that the neck was definitely squeezed. He said the bleeding around the neck was not from a kick or a chop but from progressive choking. He said he believed the choking was done through the cotton bag. He said that because the bag protected the skin, the only visible external injuries were abrasions. He said he could not estimate the time of death, but he could determine that the victim ate no more than one hour before he died. He stated that in his report, he put a question mark next to "compression marks from asphyxiation effort." He said his initial impression was that there was compression through the fabric, and he believes that the compression was the cause of death.

Michael Howard testified that he had worked with the defendant at the Branding Iron. He said the defendant was very calm and peaceful, and he never saw him angry. On cross-examination, he said he had heard that the defendant assaulted his wife on May 17, 1995, by grabbing her throat, kicking her out feet from under her, landing on top of her, and choking her. He said he considered this in forming his opinion about the defendant's reputation for peacefulness. He said he went to the defendant's house after the alleged assault occurred, and the defendant's wife did not look like she had been touched. He said that he had not heard about the same thing happening two days later but that it would not change his opinion of the defendant.

Gary Gray testified that he is the pastor of a local church and owns a vinyl business. He said that he had known the defendant for about five years through church and that they had worked together at the Passion Play. He said the defendant was peaceful and of good character. He said he was at the defendant's house on the

13

afternoon of Friday, January 19, because he wanted to make sure the defendant was keeping ties with Christian people. He said he spent about three hours with the defendant that day. He said he saw the defendant again the following Tuesday or Wednesday, and the defendant took him into his confidence as a pastor. He said he convinced the defendant that he needed to tell the police what happened at the victim's apartment, and he accompanied the defendant to the Sevier County Sheriff's Department on January 30. He testified that at that time, the defendant was smaller than he was at the time of trial, weighing about one hundred and seventy pounds. On cross-examination, he testified that he had not heard about the defendant assaulting his wife on two occasions.

Albert Cissery, Gretchen Cissery, Tom Howard, Sabrina Gray, Joan McGill and Lana Johnson all testified that the defendant was a peaceful person and was of good character. Mr. Cissery and Ms. McGill were asked if they had heard about the defendant assaulting his wife on two occasions, and they said they had not. The jury convicted the defendant upon the foregoing evidence.

### I. SUFFICIENCY OF THE EVIDENCE-PREMEDITATED MURDER

The defendant contends that the evidence is insufficient to support his conviction for premeditated murder. Specifically, he argues that the evidence of premeditation is insufficient and that the evidence supports his contention that he and the victim engaged in mutual combat. The state argues that the evidence is sufficient. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.

14

2781, 2789 (1979).  This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The defendant was convicted of the "premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  A premeditated killing is one done "after the exercise of reflection and judgment" and requires that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d).  A jury may infer a defendant's intent from the surrounding facts and circumstances. State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984).  Furthermore, a defendant's actions constitute circumstantial evidence of his intent.  State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

Viewed in this light, we believe the evidence sufficiently supports the defendant's conviction for premeditated murder.  Evidence was presented from which the jury could have concluded that the defendant brought duct tape and a bag to the victim's apartment, bound the victim with the tape, placed the bag over the victim's head and choked the victim for at least five minutes.  The defendant argues that the evidence shows a struggle and that this supports his contention that the victim started the altercation and he merely tried to subdue the victim in order to get away.  Evidence of a struggle does not conflict with a finding of premeditation and intent because the jury could have concluded that it was the victim who struggled to get away from the defendant.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983) ("A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory").  The evidence is sufficient to support the conviction.

15

## II.  FELONY MURDER

The defendant makes several contentions with respect to his conviction for felony murder.  First, he contends that the evidence is insufficient because being bound in one's home does not constitute false imprisonment.  Next, he contends that the state should have been required to elect a theory of either premeditated murder or felony murder and that the trial court erred in allowing the state to submit both theories to the jury under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991).  Finally, he contends that the dual convictions for first degree premeditated murder and felony murder violated his rights against double jeopardy.  We hold that no error exists with respect to his felony murder conviction.

### A.  SUFFICIENCY

First, the defendant contends that the evidence is insufficient to support his conviction for felony murder in the perpetration of a kidnapping.  He argues that one cannot be falsely imprisoned by being bound in one's own home.  Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Kidnapping is defined as false imprisonment "[u]nder circumstances exposing the other person to substantial risk of bodily injury[.]" Tenn. Code Ann. § 39-13-303(a)(1).  False imprisonment occurs when one "knowingly removes or confines

another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 30-13-202(a).

Although the defendant argues that one cannot be falsely imprisoned in one's own home, the plain language of the statute places no such restriction on the definition of false imprisonment. In the present case, the evidence showed that the defendant knowingly taped the victim's arms and legs individually, then bound them together. The defendant's actions obviously resulted in substantial interference with the victim's liberty because the victim could not move. The fact that the false imprisonment occurred in the victim's home is immaterial to the determination of whether it occurred. See, e.g., State v. Zonge, 973 S.W.2d 250, 254 (Tenn. Crim. App. 1997) (holding evidence sufficient to support aggravated kidnapping conviction, and victim was confined in her home). The evidence in the present case is sufficient to support the conviction.

## B. DUE PROCESS/DOUBLE JEOPARDY

The defendant contends that the jury should not have been charged with both premeditated murder and felony murder. He argues that the state should have been required to elect one theory because (1) the two theories were contradictory, and (2) if the jury found the defendant guilty of premeditated murder, any further detention from the kidnapping was incidental to the murder. See Anthony, 817 S.W.2d at 306.

First, we note that the state may proceed on theories of premeditated murder and felony murder because both are merely alternative means of committing first degree murder. See State v. Hurley, 876 S.W.2d 57, 70 (Tenn. 1993). Also, our supreme court has held that the state is not required to elect between premeditated and felony murder charged in separate counts of the indictment for a single offense. State v. Henley, 774 S.W.2d 908, 916 (Tenn. 1989).

17

The defendant argues that this case is unique because if the jury found him guilty of premeditated murder, the kidnapping would be essentially incidental to the murder. We do not believe that Anthony is implicated under the facts of the present case. The court in Anthony was concerned that the kidnapping statute "be applied so as to protect the due process rights of those accused of both kidnapping and other offenses that necessarily involve the detention of a victim." Zonge, 973 S.W.2d at 256. Although the defendant was not convicted of kidnapping, he was convicted of murder occurring in the perpetration of a kidnapping. In this respect, Anthony might protect against a dual conviction for murder committed in the perpetration of a kidnapping and another crime that necessarily involved detention, such as robbery. However, proof of premeditated murder does not necessarily prove unlawful confinement of the victim. Thus, the Anthony rationale does not apply. See Zonge, 973 S.W.2d at 256 (citing State v. Oller, 851 S.W.2d 841, 842-43 (Tenn. Crim. App. 1992)).

In any event, we do not see how the fact that the jury was presented with both premeditated murder and felony murder and the fact that they returned convictions for both harmed the defendant in light of the fact that the trial court merged both offenses into one judgment of conviction for which the defendant received one life sentence. The defendant argues that the trial court erred by allowing both convictions, and he asks this court to vacate one of the offenses. After the jury announced its verdict, the trial court stated that "the Court imposes, sir, a life sentence pursuant to the statute. I guess those merge, and there is one life sentence." The judgment of conviction reflects that the convictions were merged; thus the defendant has not shown how he was harmed.

### III. DENIAL OF CONTINUANCE

The defendant contends that the trial court erred by denying a continuance in the absence of Jimmy Sizelove, a material witness for the defense.

Specifically, the defendant argues that Mr. Sizelove had known the defendant longer than anyone else in the area and could testify regarding the defendant's good character. The defendant further argues that Mr. Sizelove could have testified regarding his knowledge of the victim's involvement in the marijuana trade. The state contends that the trial court did not abuse its discretion by denying the motion. We agree.

The trial court has discretion to determine whether to grant a continuance. Moorehead v. State, 219 Tenn. 271, 274-75, 409 S.W.2d 357, 358 (1966). The trial court's decision will only be reversed upon a showing of abuse of discretion and a showing that the defendant was prejudiced in that a different result might reasonably have been reached if the continuance had been granted. See State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973).

We conclude that the defendant has failed to show prejudice. Eight witnesses testified for the defendant about his reputation for peacefulness, and one witness had known the defendant for five years. Furthermore, evidence was presented regarding the victim's involvement with marijuana. Because the evidence the defendant sought to present from the missing witness would have been cumulative, the defendant has failed to show prejudice.

## IV. MISTRIAL

The defendant contends that the trial court erred by failing to declare a mistrial because of prejudicial and irrelevant testimony from two state's witnesses, Irene Capiello and Joe Graham. He specifically takes issue with Ms. Capiello's testimony that the defendant used cocaine, and Mr. Graham's and Ms. Capiello's references to

19

taking a polygraph examination. The state contends that the trial court correctly denied the defendant's request for a mistrial. We agree.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

### A. REFERENCE TO COCAINE USE

The defendant contends that the trial court should have granted a mistrial when Ms. Cappiello testified regarding the defendant's cocaine use. Initially, we note that the defendant does not make an argument or cite any supporting authority with respect to this issue. He merely recounts Ms. Capiello's testimony at trial that the defendant flirted with her and told her he had used cocaine. We believe the issue is waived for failure to make an argument or to cite authority. T.R.A.P. 27(a)(7).

Nevertheless, the issue is without merit because the defendant has failed to show that the trial court abused its discretion. The record reveals that at trial, the defendant's attorney objected immediately after Ms. Capiello's testimony, and the trial court instructed the jury that it should "not consider any of that . . . . Whether he's done cocaine in the past has absolutely world without end nothing to do with this case." We presume that the jury followed the trial court's instruction not to consider the testimony. State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994).

### B. POLYGRAPH

The defendant also contends that the trial court should have granted a mistrial because Ms. Capiello and Mr. Graham referred to taking a polygraph test. On

20

cross-examination, the defendant's attorney asked Ms. Capiello if she remembered talking to detectives and signing any statements. Ms. Capiello responded that she did and that she had taken a lie detector test. During Mr. Graham's direct examination, he testified that he provided detectives with hair samples and blood samples and that he took a polygraph test. Although the trial court denied the defendant's motion for a mistrial, it did instruct the jury as follows:

> Ladies and gentlemen, first of all, there's been testimony voluntarily offered by witnesses that they took polygraph examinations. Under Tennessee law, and in fact, I think in the majority of the jurisdictions across this country, the test results of a polygraph exam are not admissible in court because most appellate courts consider unreliable [sic]. So therefore, our Tennessee courts do not admit those into evidence. Therefore, any testimony in regards to the taking of a polygraph examination shall be disregarded by you, and not used for any purpose.

Ms. Capiello's and Mr. Graham's testimony regarding the polygraph examinations was inadmissible. The well-established rule in Tennessee is that the results of a polygraph examination, an offer to take a polygraph, and the circumstances surrounding the examination are inadmissible as evidence. State v. Hart, 911 S.W.2d 371, 377 (Tenn. Crim. App. 1995); State v. Irick, 762 S.W.2d 121, 127 (Tenn. 1988); State v. Adkins, 710 S.W.2d 525, 528-29 (Tenn. Crim. App. 1985); Grant v. State, 213 Tenn. 440, 443, 374 S.W.2d 391, 392 (1964). Nevertheless, the defendant has failed to show that the trial court abused its discretion by failing to grant a mistrial based upon the inadmissible testimony. The record reveals that the witnesses' references to polygraph examinations were minor, and the trial court provided a detailed curative instruction. Under these circumstances, we do not believe that the trial court erred by not granting a mistrial.

21

## V. CROSS-EXAMINATION OF CHARACTER WITNESSES

The defendant contends that the trial court did not follow the proper procedure for allowing the cross-examination of defense character witnesses regarding the defendant's alleged assault of his ex-wife when they were married. He argues that pursuant to Rule 405(a), Tenn. R. Evid., the trial court should have held a jury-out hearing to determine whether there was a clear and convincing factual basis for the alleged incident, and the trial court should have conducted a balancing test to determine whether the probative value outweighed the prejudicial effect of the evidence. He further argues that the trial court did not instruct the jury to consider the specific conduct for impeachment purposes only and not for its truth. Finally, the defendant argues that the trial court should have given a curative instruction to refute the assistant district attorney's implication that there had been an official report of the alleged abuse. The state contends that the trial court substantially complied with the procedures delineated in Rule 405(a) and argues that a curative instruction was not necessary.

> Rule 405(a), Tenn. R. Evid., provides as follows:
>
> Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
>
> (1) The court upon request must hold a hearing outside the jury's presence,
>
> (2) The court must determine that a reasonable factual basis exists for the inquiry, and
>
> (3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Once a trial court determines that an inquiry is permissible pursuant to Rule 405, Tennessee law requires that the trial court instruct the jury to consider the conduct not

for its truth but rather to evaluate the credibility of the character witness. <u>State v. Nesbit</u>, 978 S.W.2d 872, 883 (Tenn. 1998).

In the present case, the assistant district attorney notified the trial court during trial that if the defendant presented witnesses to testify about the defendant's reputation for peacefulness, he intended to ask the witnesses if they had heard that the defendant assaulted his ex-wife. A bench conference was held in which the assistant district attorney stated, "I've got a basis for it . . . I can put her [on]. I've got an absolute basis for it." The defendant's attorney then read Rule 405(a) aloud, and the following colloquy occurred:

> ASSISTANT DISTRICT ATTORNEY: Okay. Well, is the out of court hearing [sic]?
>
> COURT: Well, if we need to go further, I certainly will. If you gentlemen ask me for other things -- I mean . . .
>
> ASSISTANT DISTRICT ATTORNEY: Is the Court holding that I can ask specific bad acts, that the probative value outweighs the prejudicial effect?
>
> DEFENSE ATTORNEY: I think with regard to her testimony you're asking that, correct?
>
> ASSISTANT DISTRICT ATTORNEY: No, with regard to me asking his character witness . . .
>
> COURT: Oh, sure, yeah, on cross examination.
>
> ASSISTANT DISTRICT ATTORNEY: I've got two assaults on her.
>
> COURT: Yeah.
>
> DEFENSE ATTORNEY: Without it being clear and convincing he can ask that, about that?
>
> ASSISTANT DISTRICT ATTORNEY: I've got a factual basis for it, and I'll be glad to put her on if Mr. Miller wants me to put her on.
>
> DEFENSE ATTORNEY: I will, for the record, request that hearing where she be put on, and Your Honor make the determination as to clear and convincing. I have to do that for record purposes.
>
> COURT: Okay.

The defendant called eight witnesses who testified about the defendant's reputation for peacefulness. The assistant district attorney asked four of those witnesses if they had heard that the defendant assaulted his ex-wife. The defendant now complains that the trial court did not follow the proper procedure pursuant to Rule 405(a). Although we agree the trial court did not follow the exact procedure set forth in Rule 405(a), we believe that the requirements of the rule were satisfied. See Nesbit, 978 S.W.2d at 885; see, e.g., State v. DuBose, 453 S.W.2d 649, 652 (Tenn. 1997) (holding that substantial compliance with Rule 404(b), Tenn. R. Evid., permits deferential review).

First, the defendant complains that the trial court did not conduct a jury-out hearing to determine whether a factual basis for the inquiry existed. We agree with the defendant that the better practice would have been for the trial court to conduct a jury-out hearing during which the defendant's ex-wife could have testified about the alleged assaults. Nevertheless, the record reflects that the trial court held a bench conference, and nothing in the record shows that the jury was privy to the conference. Furthermore, although extrinsic proof of the specific conduct should be offered whenever possible, a factual basis may be found if the attorney proposing to ask the question "clearly state[s] on the record the source and origin of the information underlying the specific instance of conduct about which the inquiry is proposed." Nesbit, 978 S.W.2d at 882. We believe that the assistant district attorney's assertion that he had information from the defendant's ex-wife concerning two assaults upon her by the defendant supplied a sufficient factual basis for the inquiry.

The defendant also contends that the trial court did not conduct a balancing test with respect to the probative value and prejudicial effect. In the present case, the trial court indicated that the probative value outweighed any prejudicial effect. Again, the better practice is to place specific findings on the record in this regard.

24

Nevertheless, a review of the record shows that the requirements of the rule were satisfied.

The defendant argues that the trial court erred by not instructing the jury to consider the alleged incident not for its truth but for evaluating the credibility of defendant's character witnesses. The record shows that during its charge to the jury, the trial court did provide such a limiting instruction to the jury, and the jury is presumed to follow the trial court's instruction. State v. Walker, 910 S.W.2d 381, 397 (Tenn. 1995); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985).

The defendant also contends that the trial court erred by not giving a curative instruction to the jury to clarify the assistant district attorney's insinuation that an official report of the alleged incident existed. The defendant's complaint arises from the cross-examination of Tom Howard, one of the defendant's character witnesses. On cross-examination, the assistant district attorney asked Mr. Howard if he had heard about the defendant's assault on his ex-wife. The assistant district attorney then asked Mr. Howard if he considered this "report" when he testified about the defendant's reputation for peacefulness and if he had heard another "report" of the same incident occurring two days later. The defendant argues that the assistant district attorney's use of the word "report" implied that an official report of the incident existed and that the trial court should have instructed the jury that there was no such report. The assistant district attorney argued at trial that by "report," he meant whether the witness had heard a report of the incident from another person. Considering the context of the statement, we do not believe that the assistant district attorney's question was misleading, and the trial court did not abuse its discretion by denying a curative instruction.

## VI.  EVIDENCE OF DEFENDANT'S HONESTY AND TRUSTWORTHINESS

The defendant contends that the trial court erred by not allowing testimony regarding his trustworthiness concerning money and other valuables and his reputation for honesty. He argues that evidence of his trustworthiness concerning money and other valuables is pertinent, pursuant to Rule 404(a), Tenn. R. Evid., because he was charged with felony murder committed in the perpetration of a robbery, burglary or theft. He argues that testimony regarding his reputation for honesty is admissible because it is helpful in evaluating the credibility of the statement he gave to police. The state contends that the trial court properly denied the evidence.

Generally, evidence of a person's character or character trait is not admissible to prove action in conformity with the particular character trait. Tenn. R. Evid. 404(a). However, evidence of a pertinent character trait offered by the accused is admissible. Tenn. R. Evid. 404(a)(1); State v. Phipps, 883 S.W.2d 138, 152 (Tenn. Crim. App. 1994) ("the accused is entitled to offer evidence of 'good character . . . as tending to show that [the accused] would not commit a crime'") (quoting McKinney v. State, 552 S.W.2d 787, 790 (Tenn. Crim. App. 1977)). In this respect, we believe that the trial court erred by not allowing evidence of the defendant's trustworthiness concerning money and other valuables. The evidence related to a pertinent character trait because the defendant was charged with committing murder in the perpetration of a robbery, burglary or theft. Nevertheless, the error was harmless in light of the fact that the trial court dismissed that particular indictment.

With respect to the admissibility of evidence regarding the defendant's reputation for truthfulness, the state contends that the evidence is not admissible because the defendant did not testify at trial. Ordinarily, when a defendant attempts to show his reputation for truthfulness as relating to his credibility as a witness, the defendant must first testify. See McKinney, 552 S.W.2d at 790 ("An accused may not, of course, show evidence of his credibility as a witness by the use of character

26

witnesses unless he first testifies"). However, the defendant contends that evidence of his truthfulness is admissible not because it relates to his credibility as a witness but because it relates to the credibility of the statement he gave to police, which was in issue.

In this respect, the evidence was admissible under Rule 404 to show a pertinent character trait. Phipps, 883 S.W.2d at 153. Thus, there would be error if the trial court had excluded such testimony, but the record shows that the trial court stated, "You can ask him -- well, he can only show his good character for truthfulness and veracity in the community, period." Although the defendant may have misunderstood the trial court, the record shows that the trial court found the evidence admissible. Under these circumstances, the issue is without merit.

## VII. CLOSING ARGUMENT

The defendant contends that the assistant district attorney committed prejudicial error during closing argument by (1) appealing to the jury to consider general deterrence and (2) making an argument relating to the robbery, burglary and theft aspect of felony murder, a count which had already been dismissed. The state argues that the defendant failed to object to the deterrence argument and that both issues are without merit.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Although arguments relating to general deterrence and community conscience are not necessarily impermissible, prosecutors should use caution when making such

arguments in order to protect against inflaming the jury or appealing to its passions. State v. Pulliam, 950 S.W.2d 360, 368 (Tenn. Crim. App. 1996). Improper statements made during closing argument constitute reversible error if the statements affected the verdict. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). In making this determination, appellate courts are to evaluate the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> (2) the curative measures undertaken by the court and the prosecution.
>
> (3) the intent of the prosecutor in making the statement.
>
> (4) the cumulative effect of the improper conduct and any other errors in the record.
>
> (5) the relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The record reveals that at the end of closing argument, the assistant district attorney stated, "We can't bring [the victim] back, but we can tell this man and others like situated that we won't put up with it under this proof." Although the assistant district attorney's statement may have constituted an impermissible appeal to the jury for general deterrence, considering the factors delineated in Judge, it was not reversible error under the facts of this case.

With respect to the assistant district attorney's references to a possible theft, we do not view these comments to be error. The record shows that the prosecutor stated, "Whether in the course of [the victim] looking for a car this defendant saw the money, whether he lusted after that marijuana that he said he'd been down there to smoke with him earlier. We know this, the bag was never found; the great quantity of marijuana was never found." We view these comments as relating to a possible motive, not to the possibility that the defendant committed felony murder in the perpetration of a robbery, burglary or theft. In any event, with respect to felony murder,

the jury was instructed only as to murder in the perpetration of a kidnapping. We see no prejudice to the defendant.

## VIII. PAROLE ELIGIBILITY

The defendant contends that the trial court erred by instructing the jury on parole eligibility. He argues that the trial court's instruction would have led the jury to believe that if convicted, the defendant would not have to spend life in prison. The state argues that the issue is waived and is nevertheless without merit. We agree.

The defendant complains about the following instruction by the trial court:

> The punishment for the offense is life imprisonment, life imprisonment without the possibility of parole, or death by electrocution. The State, however, is not seeking the death penalty or life imprisonment without the possibility of parole, and therefore, should you return a verdict of guilty, the Court will impose a life sentence.

The defendant argues that the instruction is error under Farris v. State, 535 S.W.2d 608 (Tenn. 1976).

First, we view the issue to be waived because the defendant failed to raise it either at trial or in his motion for a new trial. T.R.A.P. 36(a); 3(e). Nevertheless, the issue is without merit for several reasons. In Farris, two members of the supreme court concluded that a statute requiring jury instruction on parole eligibility was unconstitutionally vague. However, our supreme court has held that the statute applicable in the defendant's case, Tenn. Code Ann. § 40-35-201(b)(2), is not unconstitutionally vague. State v. King, 973 S.W.2d 586, 590-91 (Tenn. 1998). Furthermore, in the present case, the jury was not instructed on parole eligibility and release eligibility dates; rather, it was instructed that upon a finding of guilt, the defendant would be sentenced to life in prison. The instruction was accurate, and Farris is inapposite to the instant case.

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
John H. Peay, Judge

_____
David G. Hayes, Judge